## JAMES ALEXANDER et al. v. GRENADA BANK.

Western Section. January 15, 1926.

Affirmed by Supreme Court, May 22, 1926.

1. **Appeal and error. Case will not be reversed and bill dismissed where evidence shows anything was due plaintiff.**
   In an action to recover money due on a contract where the record on appeal showed that some money was due the plaintiff, from the defendant, held that the action could not be reversed and the bill dismissed.

2. **Contracts. A building contract will not be treated as abrogated by the parties merely because the owner required certain alterations in or additions to the work where these alterations and additions did not affect the integrity and general character of the buildings originally contemplated.**
   In an action by contractors to recover for the construction of certain buildings on a cost-plus basis where the defense was that the parties had entered into a written contract for a stipulated sum but it was contended by the contractor that numerous alterations and addition had converted it into a cost-plus contract held that a contract will not be so converted unless the evidence plainly shows that it was the intention of the parties to abandon the original contract.

3. **Contracts. Evidence. Evidence held insufficient to show abandonment of contracts by parties.**

Where the evidence showed that the original contract provided for changes and additions in the construction of two bank buildings, and where the changes and additions made were small with the exception of one which was covered in a supplemental contract, held that the evidence was not sufficient to show that the parties had abandoned the original contract and thus enable the contractor to recover on a cost-plus basis.

4. **Evidence. The burden is on the contractor to show that alerations where so great as to entitle it to recover on a cost-plus basis.**

To establish the right to recover on a cost-plus basis the burden is on the complainants to show that the additions and alterations were so great that it is impossible to follow the original contract in the work as finally completed. The new work must be such that it cannot reasonably be recognized as the same building or work as that provided for in the original contract.

5. **Evidence. Proof to establish right to recover on cost-plus basis must be clear, unequivocal and convincing.**

In an action to recover for construction of buildings where it was contended that the contract had been abandoned and complainants seek to recover on a cost-plus basis, such proof of the complainants must be clear, unequivocal and convincing. Nothing short of evidence of the most satisfactory character should be permitted to brush aside a building contract which the parties have deliberately made.

6. **Evidence. Statements of an architect are not binding on his employer since he is not a general agent.**

The mere fact that a person is employed as an architect does not constitute such person a general agent of his employer, his powers as agent being limited by the contract entered into between them. Thus, unless specially authorized, he is not entitled to change, alter, or modify the contract entered into by the builder and his employer; nor has he any authority to bind the owner by contracts for any work done upon or materials furnished for the structures concerning which he is employed.

Appeal from Chancery Court, Shelby County; Hon. Israel H. Peres, Chancellor.

Modified, reversed and remanded.

Wilson, Gates & Armstrong, and Burch & Minor, of Memphis, for appellant.

Carey & Vorderbruegge, of Memphis, for appellee.

OWEN, J. Complainants are James Alexander and W. W. Wessell, partners under the name of Alexander Construction Co. located in Memphis, Tennessee. The defendant is the Grenada Bank, with its chief offices in Grenada, Mississippi, but with numerous branch banks throughout the State of Mississippi, one of the branch banks being located at Charleston, Mississippi, and another at Moorehead, Mississippi.

"The original bill averred the contract between the parties for the construction by the complainants of a two story bank building at Moorehead and a two-story bank building at Charleston, with two stores at the left of it and two stores in the rear of it, accord-

ing to plans and specifications prepared by Hanker & Cairns, architects of Memphis; that during the progress of the work the defendant insisted upon so many additions to and alterations in the work as to constitute a departure from the original plan and to entitle the complainants to recover on a cost-plus basis without regard to the limitations of cost fixed by the original contract.

"The defendant, in its answer, denied the theory of the original bill as to the cost-plus plan. With its answer defendant filed a cross-bill seeking recovery on account of defects and delays in the work.

"Defendant denied that it owed the complainant $79,000 but admitted that it was due a balance of $11,193.14 under the original contract price. However, the defendant claimed that this was entirely offset by defects in the work and delays. It charged that the delay had caused the defendant loss of rents of $5,416 at Charleston, Mississippi, and $3,040 at Moorehead, Mississippi.

"The answer and cross-bill further set up that the defects in the buildings at Charleston amounted to $7,500 and the defects in the building at Moorehead amounted to $5,000."

To this cross-bill the complainants filed an answer making a general denial. With the issues thus formed, a number of depositions were taken, accompanied by numerous exhibits, and upon hearing the Chancellor sustained the complainants' bill and allowed the complainants to recover the cost or amount the complainants had paid in the erection of two buildings, plus ten per cent (10%).

In other words, the Chancellor held that the parties had abrogated the written contract executed between the parties by reason of there having been so many alterations, additions and changes from the original plan. The Chancellor allowed the defendant credit for two small items in defective concrete in the basement in one of the buildings and for defective plastering. All the other credits for delay and inferior work, amounting to several thousand dollars claimed by the defendant, were disallowed and complainants were granted a decree against the defendant for $75,323.33, with interest from the date of the decree.

The complainants excepted to the decree of the Chancellor in not allowing interest from date of the filing of its bill. The bill was filed on August 6, 1921, seeking to recover $79,000.

The defendants excepted to the decree of the Chancellor in holding that the contract as executed July 4, 1919, between the complainants and the defendant, had been abrogated by so many alterations and changes, and the defendant also excepted to the action of the Chancellor in not permitting it to recover as an offset damages due to defects in the marble used by the complainants in the interior finishing of the two buildings. All the other credits insisted on be-

low by the defendant for delay and inferior workmanship have been abandoned.

Therefore, the complainants presented one assignment, that is, that the Chancellor erred in not allowing interest from the date of filing complainants' bill on the amount of the judgement recovered.

The defendant has four assignments of error, as follows:

1. In sustaining the cost-plus theory of the bill and in not applying the maximum limit of cost fixed by the contract between the parties.

2. In entering a judgment for complainants in any sum instead of dismissing the bill.

3. In not sustaining defendant's exceptions to the testimony of several witnesses to the effect that Mr. Hanker, the architect, declared, about September, 1920, that this work had or was about to become a "percentage job." (The original assignments meet the rule of this Court as to assignments of this kind by quoting the testimony, etc.)

4. In not allowing a recovery to the defendant for defects in the marble work.

We are presented with a large record in this cause consisting of seven volumes. We are informed that the record is only one-half as large as it was in the lower court, counsel by stipulation and agreement having eliminated certain portions of the record pertaining to the delay in the construction of the two buildings and in regard to certain defects in work and construction of said buildings. We are thankful for this elimination and stipulation of counsel, but we still have 1684 pages of testimony, more than 200 exhibits, consisting of letters and telegrams, and two volumes of original papers and documents sent up as an accompaniment or escort with the other five volumes of testimony, pleadings, orders and decrees.

It appears that during the progress of this trial, Mr. James Alexander, one of the complainants, died, and the suit is now being prosecuted by W. W. Wessell, surviving partner.

The moving spirit of the defendant is Mr. J. T. Thomas, President of the Grenada Bank in Grenada, Mississippi. Mr. Thomas also had co-operating with him a building committee. The plans and specifications for these two buildings were drawn by Hanker & Cairns, prominent architects of Memphis. It appears that Mr. W. J. Hanker was the real architect in charge. The work of construction on the two buildings was carried on simultaneously. It appears that Charleston and Moorehead are about thirty miles apart.

The contract called for the construction of a two-story bank building at Moorehead, the upper story to be used for offices, and a bank building with four stores adjoining at Charleston. Later by mutual agreement, reduced to writing, a fifth store was added to the

Charleston part of the contract. The contract, which is in the record in its original form, in its general provisions appears to be the standard document adopted by the American Institution of Architects. We quote as follows from some of the various sections of the contract:

"Article 9 is headed "The Architect's Status," and provides that he shall have general supervision and direction of the work and that "he is the agent of the owner only to the extent provided in the contract Documents, and when in special instances he is authorized by the owner so to act, and in such instances he shall, upon request, show the contractor written authority. . . . As the architect is, in the first instance, the interpreter of the conditions of the contract and the judge of its performance, he shall side neither with the owner nor with the contractor, but shall use his powers under the contract to enforce its faithful performance by both."

"Article 10 provides that the architect shall, within a reasonable time, make decisions on all claims of the owner or contractor and on all other matters relating to the execution and progress of the work or the interpretation of the contract Documents. Except as otherwise expressly provided in these general conditions or in the specifications, all the architect's decisions are subject to arbitration.

"Article 11 provides that the contractor shall keep on the work a competent foreman and any necessary assistants, all satisfactory to the architect. This foreman shall represent the contractor in his absence and all directions given to him shall be as binding as if given to the contractor.

"Article 24, headed 'Changes in the Work,' provides as follows:

"The owner, without invalidating the contract, may make changes by altering, adding to or deducting from the work, the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

"Except as provided in articles 3, 9 and 18, no change shall be made unless in pursuance of a written order from the owner, signed or countersigned by the architect, or a written order from the architect stating that the owner has authorized the change, and no claim for an addition to the contract sum shall be valid unless so ordered. The value of any such change shall be determined in one or more of the following ways . . ."

"Article 25 is headed 'Claims for Extras,' and provides that if the contractor claims that any instructions, by drawings or otherwise, involve extra cost under this contract, he shall give the archi-

tect written notice thereof before proceeding to execute the work and, in any event, within two weeks of receiving such instructions, and the procedure shall then be as provided in article 24. No such claim shall be valid unless so made.

"Article 27 provides for the issuance of certificates by the architect.

"Article 38 provides that if the owner should fail to pay to the contractor, within seven days of its maturity and presentation, any sum certified by the architect or awarded by arbitrators, then the contractor may, upon three days' written notice to the owner and the architect, stop work or terminate this contract and recover from the owner payment for all work, executed and any loss sustained upon any plant or material and reasonable profit and damages.

"Article 45 provides that, subject to article 10 (which refers to decisions of the architect), all questions in dispute under this contract shall be submitted to arbitration at the choice of either party to the dispute.

"Up to this point the contract is all in print. Then follows the agreement (in typewriting and print) covering this specific case. It provides for the construction by the contractor of a bank building and adjoining stores at Charleston, Miss., and a bank building at Moorehead, Miss., according to plans provided by Hanker & Cairns of Memphis. The work is to be done as rapidly as conditions covering material and labor will permit.

"Article 4 of this special contract enumerates the drawings and specifications, as follows:

"Charleston Bank Plans, Sheets 1 to 15 inclusive. Charleston Bank revised plans, sheets 1 to 5 inclusive. Charleston Bank specifications, sheets 1 to 21 inclusive. Moorehead Bank plans, sheets 1 to 13 inclusive. Moorehead bank specifications, sheets 1 to 16 inclusive. Including specifications for plumbing, heating and wiring for both Charleston and Moorhead.

"This contract is supplemental to and in substitution of the contracts entered into by the same parties on July 3, 1919, for the construction of the two banks herein noted."

Attached to this contract is a supplemental agreement (wholly typewritten) signed by Mr. Thomas, for the Bank, and James Alexander, for the contractor, which fixes the price to be paid. The price for the entire work was to be $138.86 "subject to additions and deductions as herein provided." In addition, the contractor was to be paid $15,622.40, by way of compensation, making the total cost to the owner $154,488. If, however, the contractor was able to complete the work for less than $138,865.60, he would be entitled

to receive by way of additional compensation 15 per cent of the amount so saved.

"In the event the work comprehended herein shall be 'more than $138,865.60, exclusive of contractor's profit, such excess cost shall be borne wholly by the contractor.'

"It was further agreed specifically that 'should a additional work be performed or additional materials furnished other than those specified herein, the amount whereof to be shall be agreed upon in advance, the owner shall pay to the contractor an amount equal to such added cost, plus ten per cent thereof.' "

When it appears that the bill in this cause was filed August 6, 1921, the building at Charleston had not been completed an agreement without prejudice in writing was entered into whereby the defendant bank met the payroll of the complainants and paid out additional sums, and the Charleston work was completed about the middle of October, 1921, or about two years three months from the date of the execution of the original contract. A great deal of the work in constructing said buildings was done by sub-contractors. The complainants secured and had in charge at Charleston a superintendent by the name of F. C. Wardall. As superintendent at Moorehead complainants had a Mr. Johnson, who was succeeded by a Mr. Frazier, and who was succeeded by a Mr. J. B. Johnson. The defendant had as its superintendent over both pieces of work Mr. C. C. Coates, who appears to have been an Englishman. Mr. Coates died about the latter part of August, 1920, and he was succeeded as superintendent for the defendant by Mr. Lyman Abbott (not the Editor of the Outlook). It appears that the complainant W. W. Wessell did practically all of the work, actual, for the complainants in constructing these buildings. The bookkeeper for the complainants was Mrs. Anna H. Thorpe, who kept an account of actual cost of work done at both places. The marble work for the two buildings was sub-contracted to Peter Burghard Stone Co. of Louisville, Kentucky. The plumbing contractor at both places was A. L. Pritchard of Memphis. His foreman was John A. Taylor. The heating contractor was Walter J. Hughes of Memphis, for both places. The plastering was sublet to John M. Murray for both places. The electrical work was let to J. A. Fowler at Charleston and the Dawkins Electrical Co. of Moorehead. The roofing and sheet metal work was let to Nohsey & Schwab of Memphis for both places. All these parties, with their foremen and numerous other witnesses, testified.

We find in the record 49 depositions many depositions covering numerous pages. The complainant took twenty-three depositions and complainant relies upon the following propositions:

1.  That the work was altered, changed and enlarged to a degree that would in law amount to a different undertaking from that assumed in the original contract.

2.  That the owner took charge of the direction and supervision of the work.

3.  That it was an impossibility to keep any accurate record or account of the cost of the changes, alterations and additions.

4.  In addition to the contentions hereinbefore made, the course of conduct of the defendant bank, through both its president, its architects and its representative, Coats, was such as to effect in law and equity a substitution of the cost plus plan for the limitation of price named in the original contract.

5.  That the marble work was in accord with the specifications, up to sample and approved and accepted by the architects.

6.  That the complainants should have been awarded interest.

The defendant makes the following propositions:

There were some changes and alterations in the work and some extras, but (except as to the fifth store and extension of other stores incidental thereto, which was mutually agreed upon early in the work) they were all with respect to detail and were not such as to bring about a material variance from the original plans and specifications.

The contract expressly provided that the owner, "without invalidating the contract, may make changes by altering, adding to or deducting from the work."

The principal reliance of the complainants as to changes and alterations is the testimony of witnesses that one Coates, who was the foreman representing the bank from late in August, 1919, until his death a year later, arbitrarily directed numerous alterations. Aside from the fact that much of this testimony is emphatically denied, it clearly appears that on many occasions after the death of Coates the complainants indicated by their conduct and their correspondence that they regarded the contract as still in full force and effect. The defendant insist that the written contract provided that the maximum amount the defendant should pay for the work at Charleston was $105,797 plus the cost of additions and alterations, if any. Eliminating the cost of the additional store and the extension of two other stores at Charleston, which was the subject of a mutual agreement early in the work, complainants' own statement shows 'the total cost of the extra work at Charleston was only' $12,990.97, or 12 per cent of the maximum price mentioned. Many of the changes and alterations claimed by complainants in that statement consisted of the correction of work which was inherently faulty or was not in accordance with the plans and specifications, and the cost of all the extras as shown in complainants' statement is seriously contested by defendant.

There were few changes or additions at Moorehead.

"Not until the original bill herein was filed did the complainants or any representative of theirs suggest that the contract had been abrogated or that a right to recover on a cost-plus basis had arisen." There was no reference to such a theory by any complainant or their representative.

"There were many defects and short-comings in the marble work; it was wholly bad and by no means met the specifications."

We have endeavored to state briefly the contentions and propositions of fact as contended by the parties to this litigation. While Mr. Hanker, the architect, no doubt could have thrown much light upon the construction of these buildings, yet his deposition was not taken by either party.

We will first dispose of defendant's contention that the marble was defective. The contract called for "field of wainscot, rail and counter to be Tavernelle in dark and light shades as shown. Sample of marble may be seen in architect's office."

The sub-contractor testified that he had installed marble in the two bank buildings in accordance with the sample exhibited by the architect. Tavernelle marble is a foreign marble. It is imported from Northern Italy. Defendant insists that in the marble placed in the two bank buildings there were cracks and fissures, which had been filled in with wax of the same shade as the marble. It appears that Tavernelle marble has certain cracks in it; that these cracks are formed by geological formations; and that you do not get this grain of marble without having marble that contains certain cracks. The marble men take a slab of marble before it is highly polished and the slab is laid on a heated table or bench and the cracks in the marble are filled with shellac, and after this heating process the slab of marble with its cracks shellacked is placed under a wheel, and by using certain devices it is highly polished. It is then shipped to the building in which it is to be installed and placed in its proper sphere. These cracks are only discernible by miscroscope or by rubbing your hand over the piece of marble you may be able to locate the crack that has been filled by wax or shellacked. We are of the opinion from the weight of evidence the defendant secured the quality of marble complainants agreed to place in the buildings, and numerous witnesses testify that it is beautiful work, a complete job, and it met the approval of the architect, Mr. Hanker, The defendants' assignment as to defects in the marble is overruled.

As to defendant's assignment of error that the case should be reversed and bill dismissed, this is overruled for the reason that by the terms of the contract the defendant was to pay $154,488 as the total sum to complete the two buildings, and the contract further provided for the payment by the defendant for extra work.

The record shows that the defendant has paid to complainants $147,185.50 in cash, and that the Chancellor gave defendant credit for $770 for defects in concrete work and in plastering, making a total credit of $147,955.50. Thus it will be seen that the defendant is due the complainant's $6533 without allowing the complainants anything for the extra work. Complainants' proof, as submitted in the exhibits filed by its witnesses Wardall, who was Superintendent at Charleston, and Johnson, who was Superintendent at Moorehead, show that practically 100 changes and extras were made on the two constructions. It appears that the architect, Mr. Hanker, wrote the defendant September 24, 1920, that the extras at Charleston amounted to $29,976.01. The defendant's witness, Mr. C. E. Lockett, who is a contractor, builder and lumber dealer at Grenada, Mississippi, and who appears to be a very intelligent witness, testifies that the reasonable extras in extending two of the stores at Charleston was worth $4150.04. For building the extra store at Charleston, which was not included in the original first contract, complainants charge something more than $12,000. The defendant's president, Mr. J. T. Thomas, testified that Mr. Coates, the defendant's superintendent at Charleston, had made an estimation prior to Coates' death in which Coates estimated the extra store house built by the complainants to be worth $8,000. So we find as a fact that there is some amount due the complainants, and that assignment of error insisting that complainants' bill be dismissed is disallowed.

As to whether or not the original contract was changed from a specified amount plus payment for extras according to terms of contract, was abrogated, annulled and the contract became a cost-plus contract, we are of the opinion that the Chancellor was in error in so holding and decreeing that the original contract had been annulled and that the contract became a cost-plus contract, or as termed by some of the witnesses, "a percentage job."

Many of the changes made in the construction of the two bank buildings and stores were not vital changes, and in making these alterations the complainants were not put to any extra cost. The contract provides that alterations and additions were authorized at the instance of the owner, who was to pay the cost thereof plus a fare or compensation for the contractor.

"The store known in the record as Store No. 1 was not included in the plans contemplated by and made a part of the original contract. Shortly after the contract was made, however, Mr. Thomas concluded to have this store built. To that end he saw Wardall, Alexander's foreman at Charleston, and asked him to write to his people and see if they would build it, Hanker & Cairns to draw

necessary plans including a lengthening of Stores 2 and 5. The elongation of Store No. 4 was a part of the original contract.''

Complainants constructed this extra store and extended Stores 2 and 5 under the terms of the original contract.

We find the following agreement entered into by the parties as to this extra work:

> "This agreement, made the 27th day of September, 1919, by and between the James Alexander Construction Co. of Memphis, Tennessee (hereinafter designated the Contractor) and Bank of Charleston, Charleston, Mississippi (hereinafter designated the Owner).
>
> "The contractor agrees to furnish all materials and do all labor necessary for alterations and additions to buildings as contracted for on date of July 4, 1919, and to furnish all materials and do all labor necessary for a one-story brick store, all as shown on revised plans, consisting of five sheets, dated September 23, 1919. It is agreed that this agreement is to be an addenda to contract dated on July 4, 1919, and that all of the provisions therein are to apply in the said alterations, additions and erection of one-story buildings.''

On September 29, it appears that the contractor acknowledged receipt of a letter from the architect, the architect having written to the contractor to proceed with the additions as shown on revised drawings dated September 23, 1919.

Some of the material facts established in this record are as follows:

> "On August 30, 1920, Mr. Alexander wrote to the architects asking for 'extra covering difference in cost of face brick' amounting to $144. There were many subsequent letters by the contractors making claim for extras, but these will be elaborated under another heading.
>
> "In a letter by the contractors to Mr. Thomas of July 3, 1920, the contractors enclosed a letter from the subcontractor in charge of the electrical work saying 'we assume that Mr. Coates has authority from Mr. Thomas to order these changes and this will be considered extra.' Mr. Thomas at once replied that such an assumption was wrong, citing the provision of the contract.
>
> "On September 23, 1920, complainants wrote to Mr. Thomas saying, 'there will apparently be no controversy with regard to the Morehead work and what we are writing about is advances on the Charleston work.'
>
> "On November 4, 1920, at which time the building at Moorehead was about completed, complainants wrote a letter to Mr. Thomas which had reference to the appointment of Lyman Abbott as the owner's foreman on both jobs, in which they said:

"I was at Charleston Monday and instructed our Superintendent in the presence of Mr. Abbott that he was the boss and that his instructions must be carried out 'insofar as the work being done according to plans and specifications,' and changes contrary to plans and specifications we would expect him to give our Superintendent an order for same, so that we would have the authority for making the changes should Mr. Abbott be taken away for some unknown reason."

"On November 23, 1920 (the Bank at Moorehead being then entirely completed), complainants wrote another letter to Mr. Thomas, in which they said:

"As we wrote you before, we are willing to give your Mr. Abbott full control of the buildings at Charleston, making our superintendent subordinate to him in carrying out all this work, he, of course, 'only to carry it out as per plans and specifications and instructions from your architect, Hanker & Cairns.'"

"On December 4, 1920, the attorneys for the complainants wrote to the defendant:

"As you probably know, the original contract price on the Moorehead job was $50,042, and on the Charleston job was $104,446; therefore, you have not paid more than 80 per cent of the original contract price, without taking into consideration the enormous amount of extras which Mr. Alexander has put on the work."

There was not a line in this letter indicating any thought of the cost-plus theory. Nothing could be a more emphatic recognition of the contract as still in force than this letter, written—by able lawyers.

"Late in the fall of 1920, when the parties were in disagreement about payments to be made by the bank, Mr. Thomas wrote a letter of November 6, 1920, saying that he had told the contractors and written to them several times that 'we are ready to pay bill for extras in full, and in view of this fact we are due you nothing under the terms of the contract; to the contrary, we have over-paid.' A few days later—December 4, 1920—attorney for the contractors replied, saying that Mr. Alexander had told them that the bank was 'in possession of a complete statement for extras.' Mr. Thomas' letter presented a distinct issue on the subject of extras and attorneys for the contractors answered by saying that the bank already had a complete statement for the extras. Nothing could more clearly show the understanding of the parties at that time—December 4, 1920, when one building was complete and the other far towards completion—that the contract was still in force. It is not claimed that serious changes or additions took place thereafter.

"As late as June 16, 1921, 'the contractors' wrote to Lyman Abbott, the foreman on the job, saying:

"Replying to your letter of June 14th, referring to progress being made on the old bank building, we earnestly request that you send your communications in this matter to Hanker & Cairns, the Architects; under the circumstances we are obliged to take all of our orders from Hanker & Cairns, and as soon as they advise us as to what is to be done on the old bank we will proceed with the work."

"The understanding of the architects is indicated by the following-themselves regarded the original contract as in full force and effect.

"The understanding of the architects is indicated by the following letter from them to the bank, written as late as July 20, 1921:

"Relying to your letter of July 18th, with regard to list of extras on the Bank of Moorehead, we beg to say that Mr. Hanker has been out of town for the past week. We have requested the James Alexander Construction Company to send us this list, and upon receipt of same we will forward you a copy immediately."

We are of the opinion that this original contract, with its addendum—which included the building of an extra store and the extension of two of the stores described as No. Two and Five in the record—should be upheld. The complainant should be paid the cost of all necessary extras and for all changes or alterations made in the plains by the direction of defendant's Superintendent, which alterations increased the cost of the construction, and we are of the opinion that the true, and proper, and reasonable amount due the complainants for this extra work, plus their ten per cent (10%) for proper compensation to the contractors, can be ascertained upon a proper reference directed by the Chancellor and made by the clerk & master or a special commissioner, appointed by the Chancellor, here.

"The upholding of private contracts and the enforcement of their obligations are matters of highest moment and importance to the public welfare. Dubuque Ry. v. Richmond, 19 Wall., 590.

"The building contract will not be treated as abrogated by the parties merely because the owner required certain alterations in or additions to the work where these alterations and additions did not affect the integrity and general character of the buildings originally contemplated. Perkins Oil Co. v. Eberhart, 107 Tenn., 431; Young v. Jeffreys, 20 N. C., 221.

"It is only where the original plan is so entirely abandoned that it is impossible to trace the contract and say to what part of the work it shall be applied that the contractor is entitled to ignore the provisions of the original contract as to compensation and re-

covery upon a quantum meruit. Warren v. Goodrich (Va.), 112 S. E. Rep., 693; Pepper v. Beuland, Peake's N. P., 103; Hollinsead v. MacTier, 13 Wend., 276; Hood v. Smiley, 5 Wyo., 70; 9 Corpus Juris, 721-2; Bozarth v. Dudley (N. J.), 43 Am. Rep., 373.

"Modifications or variations not affecting the inherent character of the work contemplated do not abrogate the contract especially where it expressly provides, as does the contract involved, that alterations in the plans may be made, 'without invalidating the contract.' 9 Corpus Juris, 721-2.

"To establish the right to recover on a cost-plus basis the burden is on the complainants to show that the additions and alterations were so great that it is impossible to follow the original contract in the work as finally completed. The new work must be such 'that it cannot reasonably be recognized as the same building or work as that provided for in the original contract.' Warren v. Goodrich (Va.), 112 S. E. Rep., 694; Hood v. Smiley, 5 Wyo., 70.

"Such proof by the complainants 'must be clear, unequivocal and convincing.' 'Nothing short of evidence of the most satisfactory character should be permitted to brush aside a (building) contract which the parties have deliberately made.' Warren v. Goodrich (Va.), 112 S. E. Rep., 694; O'Keefe v. Church, 59 Conn., 56."

We are of the opinion that the modifications, variations extensions and changes in the work of construction of the buildings described in the contract in the instant case are not of such character as would abrogate and invalidate the contract executed. The original contract and plans were not so entirely abandoned that it is impossible to trace the contract, and we are of the opinion that the parties are not entitled to ignore the provisions of the original contract executed by the parties to this litigation, and complainants assignment that the court was in error in sustaining the cost-plus theory of the complainant bill, is sustained.

We are of the opinion that the Chancellor also was in error in permitting the witnesses, most of them being subcontractors, to testify that the architect, Hanker, had stated to these witnesses that the work had so progressed that it had become a percentage job, or words to this effect.

"The mere fact that a person is employed as an architect does not constitute such person a general agent of his employer, his powers as agent being limited by the contract entered into between them. Thus, unless specially authorized, 'he is not entitled to change, alter, or modify the contract entered into by the builder and his employer;' nor has he any authority to bind the owner by contracts for any work done upon or materials furnished for the structures concerning which he is employed." 6 Cyc., 29-30.

"Waite in his work on Engineering Architectural Jurisprudence, in speaking of the powers of architects and engineers, says (sec. 371) : 'The engineer is an agent with special power simply to do the engineering and to superintend and direct the work. Unless specially conferred, he has no power to contract or to vary the terms of the parties' agreement. He can create no new obligation not embraced by the contract' . . . In 2 A. & E. Encyc. of Law (2 Ed.), 820, it is said: 'An architect superintending the erection of a building has no authority generally to make alterations in the plans and specifications and binding his employer for extra work or to make any changes in the original contract.' " Mallard v. Moody, 105 Ga. 404.

In the case of Leverone v. Arencio, 179 Mass., 442, the Supreme Court of Massachusetts in construing the duties of an architect, and his rights, says:

"The provision of article 1 of the contract that 'under the direction and to the satisfaction of the architect, acting for the purpose of this contract as agent of the said owner, shall and will provide all of the materials and perform all the work mentioned in the specifications and shown on the drawings' does not go further than to make the architect the agent of the owner in the matter of deciding whether the work done fulfills the requirements of the specifications and drawings. Apart from an agreement to that effect, an architect is not the general agent of the owner. See McIntosh v. Hastings, 156 Mass., 344; Adland v. Muldoon, 45 Ill., 193; Glacius v. Black, 50 N. Y., 145. The provision in this contract did not give the architect authority to waive, in behalf of the owner, the terms on which the owner had stipulated in writing that the payments for the work were to be made when the work described had been done to the architect's satisfaction."

In the case of Shenan Co. v. Sisters, 77 Wash., 256, it was held that the assurance of the supervising architect in charge of the work to a subcontractor, directing him to go ahead, could not excuse the failure of a subcontractor to perfect his lien for the reason that the architect had not implied authority to bind the owner beyond expressed terms of contract.

The learned Chancellor in the instant case was of the opinion that the statements made by architect Hanker were made within the scope of his authority, and were binding upon the owner of the bank buildings. In so holding, we are of the opinion that he was in error, and defendant's assignment of error complaining of the action in permitting witnesses to testify as to Hanker's statements is sustained.

The decree of the lower court is reversed insofar as it conflicts with the two assignments we have sustained, and the case is remanded to the chancery court of Shelby county for the purpose of having a reference to ascertain the extras done by the complainants on the various buildings built according to the terms of the contract, the reasonable cost for such extra due the complainants, and their reasonable profit or commission for the extras constructed.

Of course, in extras, there is meant the changes and alterations wherein the construction was increased in cost to the contractors.

On the question of complainants' assignments as to interest, that assignment becomes immaterial now and is overruled.

The cost of this appeal will be paid, one-half by the complainant, one-half by defendant. The cost of the lower court will be paid as decreed by the Chancellor.

Modified, reversed and remanded.

Heiskell and Senter, JJ., concur.